UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

U.S. SECURITIES AND EXCHANGE
COMMISSION

                    Plaintiff,

          - against -

CLARICE SAW,

                    Defendant.

---

**MEMORANDUM
OPINION & ORDER**

23 Civ. 6573 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          In this civil enforcement action, the Securities and Exchange Commission (the "SEC") alleges that Defendant Clarice Saw committed securities fraud in violation of 15 U.S.C. §§ 77q(a)(1) and (a)(2) (the "Securities Act"), 15 U.S.C. § 78j(b) (the "Exchange Act"), and 17 C.F.R. § 240.10b-5 ("Rule 10b-5").  (Cmplt. (Dkt. No. 1) ¶¶ 57-62)  According to the SEC, Saw misappropriated approximately $2.4 million from Fu Sheng Jiang, an elderly man who was one of her brokerage clients.  (Id. ¶ 1)  The SEC alleges that Saw obtained a power of attorney from Jiang and then liquidated his assets, transferred the proceeds through a series of accounts, and used the funds for her personal use – all without Jiang's knowledge or consent.  (Id. ¶¶ 2-3)

          The SEC has moved for summary judgment as to liability.  (Not. of Mot. (Dkt. No. 32))  For the reasons stated below, the SEC's motion for summary judgment will be granted.

# BACKGROUND

## I.    FACTS[1]

### A.    Background Concerning Jiang and Saw

Fu Sheng Jiang was born in Beijing, China, and immigrated to the United States in 1988.  (Pltf. R. 56.1 Stmt. (Dkt. No. 33) ¶¶ 1-2)  His native language is Mandarin.  (Id. ¶ 3)  As of March 2024, he was 90 years old.  (Id. ¶ 1)[2]

In October 2015, Jiang's wife died, and Jiang was the beneficiary of his late wife's insurance policy, which was worth approximately $1 million.  (Id. ¶¶ 4-5)  Jiang also received approximately $720,000 from a lawsuit related to his wife's death.  (Id. ¶ 6)  As of July 2020, the funds from the insurance policy and the lawsuit were valued at approximately $1.8 million. Jiang's wife was his last living immediate family member.  (Id. ¶ 8)

Defendant Clarice Saw has been associated with registered broker-dealers and investment advisors since 1996.  (Id. ¶ 9)  From November 2016 to September 2021, she was a registered representative at Citigroup Global Markets Inc., a registered broker-dealer.  (Id. ¶ 10) Saw has the same ethnic background as Jiang, and speaks both Mandarin and English.  (Id. ¶ 11)

---

[1]  To the extent that this Court cites facts drawn from the SEC's Local Rule 56.1 statement, it has done so because Saw has not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Here, Saw has not cited any admissible evidence in support of her denials.  (See Def. R. 56.1 Cntrstmt. (Dkt. No. 38))  Accordingly, the material facts set forth by the SEC are deemed admitted.  See Mangahas v. Eight Oranges Inc., 754 F. Supp. 3d 468, 483 (S.D.N.Y. 2024) ("If portions of a Local Rule 56.1 counterstatement cite to no admissible evidence in support of its denials, the Court is instructed to disregard those portions and deem the factual statements in the original Local Rule 56.1 statements admitted.").

[2]  According to the SEC, Jiang died on May 31, 2024.  (See Pltf. Reply Br. (Dkt. No. 37) at 4 n.2); see also Obituary, Fu Sheng Jiang, Dignity Memorial, https://www.dignitymemorial.com/obituaries/queens-village-ny/fu-sheng-jiang-11843865.

In July 2020, Jiang opened a brokerage account at Citigroup, where Saw was his registered representative. (Id. ¶ 12) At about this time, Saw learned that Jiang had substantial assets and no immediate family. (Id. ¶ 13)

**B.     Saw Obtains a Power of Attorney from Jiang**

On December 23, 2020, Saw and Jiang signed a New York Statutory Short Form Power of Attorney ("POA"). (Id. ¶¶ 14, 18; id., Ex. 4 (POA) (Dkt. No. 33-5)) In the Power of Attorney form, Jiang designated Saw as his agent, and empowered her to act on his behalf with respect to, inter alia, bond, share, and commodity transactions; estate transactions; and tax matters. (POA (Dkt. No. 33-5) at 4) Section (n) of the Power of Attorney form is entitled "IMPORTANT INFORMATION FOR THE AGENT," and states the following:

> You may not use the principal's assets to benefit yourself or anyone else or make gifts to yourself or anyone else unless the principal has specifically granted you that authority in this document, which is either a Statutory Gifts Rider attached to a Statutory Form Power of Attorney or a Non-Statutory Power of Attorney.

(Id. at 6) Jiang did not sign the statutory gifts rider. (Id. at 9-11; Def. R. 56.1 Cntrstmt. (Dkt. No. 38) ¶ 17 (conceding that Jiang did not sign the statutory gifts rider))

The SEC deposed Saw in this action, and at her deposition she asserted her Fifth Amendment privilege in response to all questions concerning the Power of Attorney form. (Pltf. R. 56.1 Stmt. (Dkt. No. 33) ¶ 19)

**C.     Saw Moves to Cetera Investment Services**

In September 2021, Saw left Citigroup and began working as a registered representative at Cetera Investment Services, LLC ("Cetera"), another registered broker-dealer. (Id. ¶ 20) On October 29, 2021, Jiang opened a brokerage account at Cetera, and transferred all of his holdings in his Citigroup account to the new Cetera account. (Id. ¶ 21)

When Saw joined Cetera, she signed an "Investment Executive Agreement," which required her to, inter alia, "be familiar with an[d] comply with all rules, requirements, and policies set forth in [Cetera's] applicable compliance, conduct and supervisory manuals." (Id. ¶ 26 (quoting id., Ex. 7 (Dkt. No. 33-8) at 3)) Cetera's Registered Representative Manual (effective as of September 1, 2021) includes the following provisions:

- Section 4.12.5: "Registered Representatives may not under any circumstances commingle customer funds or securities with their own . . . ." (Id., Ex. 6 (Cetera Registered Representative Manual) (Dkt. No. 33-7) at 19)

- Section 4.12.6: "Registered Representatives may not share in or maintain a joint account with any person (other than an immediate family member) . . . ." (Id.)

- Section 4.12.25: "With the exception of immediate family, Registered Representatives are prohibited from being named as [a] beneficiary on an account or from acting in the capacity of a guardianship, conservator, trustee, power of attorney, or any similar type of relationship on behalf of any unrelated person without first obtaining written approval from the Firm's Home Office." (Id. at 22)

There is no record of Saw ever requesting or receiving approval from Cetera to obtain a power of attorney as to anyone. (Pltf. R. 56.1 Stmt. (Dkt. No. 33) ¶ 31, 33) At her deposition, Saw asserted her Fifth Amendment privilege in response to all questions regarding Cetera's prohibition against obtaining a power of attorney for "any unrelated person" absent Cetera's written approval. (Id. ¶ 35)

**D.    Jiang's Injury and Hospitalization**

On November 18, 2021, Jiang was struck by a motorcycle in Manhattan. (Id. ¶ 36) He was transported to Bellevue Hospital to be treated for his injuries. (Id. ¶ 37) On December 7, 2021, Jiang was transferred to a nursing home for further recovery, where he remained until July 6, 2022. (Id. ¶ 38) Saw learned of the accident and Jiang's injuries soon after the incident. (Id. ¶ 39)

E.    **Saw's Actions Regarding Jiang's Bank and Investment Accounts**

    1.    **The TD Bank Accounts**

Prior to his accident, Jiang maintained a bank account in his own name at TD Bank N.A.  (Id. ¶ 40)  On December 1, 2021, while Jiang was in Bellevue Hospital, Saw added her name as an account owner for this account.  (Id. ¶¶ 37-38, 41)  Jiang did not give Saw permission to do so, and he was unaware that she had done so.  (Id. ¶ 42)  At her deposition, Saw asserted her Fifth Amendment privilege in response to all questions regarding adding her name to this TD Bank account.  (Id. ¶ 43)

On December 3, 2021, using the Power of Attorney, Saw opened a new bank account at TD Bank, and named herself as the primary account owner, and Jiang as the co-owner. (Id. ¶ 44)  Jiang did not give Saw permission to open this second TD Bank account, and he was unaware that she had done so.  (Id. ¶ 45)  At her deposition, Saw asserted her Fifth Amendment privilege in response to all questions about opening this second TD Bank account.  (Id. ¶ 46)

    2.    **Transfers out of Jiang's Cetera Account**

Cetera employees use a proprietary internet-accessible portal called "SmartWorks" to view client profiles, documents, and holdings, and to place trades or enter account notes.  (Id. ¶ 47)  On December 15, 2021, Saw input the following note in the SmartWorks system concerning Jiang's account:

> Due to a change in [Jiang's] health, he decided to fully liquidate all his positions in this account.  He wants all his funds to be in cash in his bank account to be ready to be donated away/distributed.  Client has made substantial gains in the account and is aware of all the tax consequences.  All gains in his account are long term (over a year).

(Id. ¶ 50 (alteration in original))

The information Saw input at this time was false, because after Jiang's November 2021 accident he did not give Saw permission to conduct any financial transactions on his behalf.

(Id. ¶ 49)  At her deposition, Saw asserted her Fifth Amendment privilege in response to all questions regarding this note in the SmartWorks system.  (Id. ¶ 52)

On December 16, 2021 – the day after inputting the note into SmartWorks – Saw sold approximately $1.7 million worth of securities held in Jiang's Cetera account.  (Id. ¶ 53) Jiang did not give Saw permission to sell these securities and he was unaware that she had done so.  (Id. ¶ 54)  At her deposition, Saw asserted her Fifth Amendment privilege in response to all questions regarding her liquidation of the securities held in Jiang's Cetera account.  (Id. ¶ 55)

The same day that the securities were sold, Saw transferred the approximately $1.7 million in proceeds from Jiang's Cetera account to Jiang's original TD Bank account, to which Saw had added her name as co-owner.  (Id. ¶ 56)  Jiang did not give Saw permission to transfer these funds from his Cetera account to the TD Bank account, and he was unaware that she had done so.  (Id. ¶ 57)  At her deposition, Saw asserted her Fifth Amendment privilege in response to all questions regarding her transfers from Jiang's Cetera account to the TD Bank account.  (Id. ¶ 58)

The next day – December 17, 2021 – Saw transferred the approximately $1.7 million in proceeds from Jiang's original TD Bank account to the second TD Bank account that Saw had opened.  (Id. ¶ 59)  Jiang did not give Saw permission to transfer these funds from his original TD Bank account to the second TD Bank account, and was unaware that she had done so.  (Id. ¶ 60)  At her deposition, Saw asserted her Fifth Amendment privilege in response to all questions regarding her transfer of $1.7 million from the original TD Bank account to the second TD Bank account.  (Id. ¶ 61)

On December 20, 2021, Saw sold approximately $734,000 worth of securities held in Jiang's Cetera account without Jiang's knowledge or authorization.  (Id. ¶¶ 62-63)  That

same day, Saw transferred $734,000 from the Cetera account to Jiang's original TD Bank account, again without Jiang's knowledge or consent.  (Id. ¶¶ 64-65)  Later that day, Saw transferred $732,000 from the original TD Bank account to the second TD Bank account she had opened, again without Jiang's knowledge or authorization.  (Id. ¶¶ 66-67)  As a result of these transfers, by January 7, 2022, Jiang's original TD Bank account held only $1,967.02.  (Id. ¶ 68)

###  3.    Transfers from the Second TD Bank Account to Saw's Personal Bank Account

During the period between December 23, 2021 and February 18, 2022, Saw transferred $2 million from the second TD Bank account to her personal bank account, as shown below:

| Date | Amount |
|---|---|
| December 23, 2021 | $300,000 |
| December 31, 2021 | $1,000,000 |
| January 24, 2022 | $300,000 |
| February 18, 2022 | $400,000 |
| Total | $2,000,000 |

(Id. ¶¶ 69-72)  Jiang was unaware of these transfers and did not authorize them.  (Id. ¶ 73)  At her deposition, Saw asserted her Fifth Amendment privilege in response to all questions regarding the $2 million in transfers from the second TD Bank account to her personal account.  (Id. ¶ 74)

###  4.    Saw's Use of the Second TD Bank Account for Withdrawals and Personal Expenses

Between December 2021 and March 2022, Saw withdrew thousands of dollars in cash from the second TD Bank account, as shown below:

| Date | Amount |
|---|---|
| December 31, 2021 | $7,000 |
| February 28, 2021 | $4,000 |
| March 22, 2022 | $1,000 |
| **Total** | $12,000 |

(Id. ¶ 75)  Jiang did not authorize these cash withdrawals.  (Id. ¶ 76)  Saw also used the second

TD Bank account for her personal expenses – without Jiang's authorization – as shown below:

| Date | Transaction Location | Amount |
|---|---|---|
| December 31, 2021 | Louis Vuitton | $639.41 |
| February 28, 2021 | Verizon Wireless | $386.67 |
| March 22, 2022 | Shoprite | $153.27 |
| | **Total** | $1,179.35 |

(Id. ¶ 77-78)  By March 25, 2022, only $424,262.00 remained in the second TD Bank account

(Id. ¶ 79)

### 5.    Transfers from Saw's Personal Bank Account to Her Brokerage Account

In January and February 2022, Saw made numerous transfers from her personal

bank account to her personal wealth management account (the "Saw Brokerage Account"), as

shown below:

| Date | Amount |
|---|---|
| January 7, 2022 | $500,000 |
| January 12, 2022 | $500,000 |
| January 25, 2022 | $200,000 |
| February 2, 2022 | $200,000 |
| **Total** | $1,400,000 |

(Id. ¶¶ 80-83)  Jiang never authorized Saw to transfer his money to a brokerage account that was

solely in Saw's name.  (Id. ¶ 84)  At her deposition, Saw asserted her Fifth Amendment privilege

in response to all questions regarding the transfers from her personal bank account to the Saw Brokerage Account.  (Id. ¶ 85)

### 6.    Saw's Use of the Remaining Funds in Her Personal Bank Account

Of the $2 million that Saw transferred from the second TD Bank account to her personal bank account, she transferred $1.4 million to the Saw Brokerage Account, leaving $600,000 in her personal bank account.  Between December 2021 and March 2022, Saw made a number of cash withdrawals from that account, as shown below:

| Date | Amount |
|---|---|
| January 13, 2022 | $1,000 |
| February 11, 2022 | $1,000 |
| February 22, 2022 | $1,000 |
| **Total** | **$3,000** |

(Id. ¶ 86)  Saw also used the funds in her personal bank account for personal expenses, as shown below:

| Date | Transaction Location | Amount |
|---|---|---|
| December 23, 2021 | Mercedes Benz of Brooklyn | $25,000.00 |
| December 27, 2021 | Mercedes Benz of Brooklyn | $5,000.00 |
| December 30, 2021 | Empire City Casino | $1,547.95 |
| | **Total** | **$31,547.95** |

(Id. ¶ 87)  Jiang did not give Saw permission to use his money to make her car payments or at the casino.  (Id. ¶¶ 88-89)

On February 28, 2022, Saw transferred $360,408.81 from her personal bank account to a second personal bank account in her name.  (Id. ¶ 90)  Once these funds were transferred, Saw used that money for various personal expenses, including:  (1) a $31,500 personal check to an individual, posted on March 14, 2022; (2) a $66,865.33 personal check to

Shellpoint Mortgage Servicing, posted on March 28, 2022; and (3) a $200,000 electronic funds transfer to Saw's personal investment account at Cetera, posted on April 5, 2022.  (Id. ¶ 91) Jiang did not authorize any of these uses of his assets.  (Id. ¶¶ 92-93)  At her deposition, Saw asserted her Fifth Amendment privilege in response to all questions regarding her use of the money she transferred out of Jiang's account.  (Id. ¶ 94)

## II.  **PROCEDURAL HISTORY**

The Complaint was filed on July 28, 2023, and alleges that Saw violated Sections 17(a)(1) and (a)(2) of the Securities Act; Section 10(b) of the Exchange Act; and Rule 10b-5. (Cmplt. (Dkt. No. 1) ¶¶ 57-62)  The Complaint seeks a final judgment:

> Permanently enjoining Saw and her agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

> Ordering Saw to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

> Ordering Saw to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

> Granting any other and further relief this Court may deem just and proper.

(Id. at 9-10 (alterations in original))  Saw filed an Answer on September 20, 2023, and two Amended Answers on October 6, 2023.  (Dkt. Nos. 9, 12-13)

On July 16, 2024, the SEC filed the instant motion for summary judgment.  (See Pltf. Mot. (Dkt. No. 32); Pltf. Br. (Dkt. No. 34))

## DISCUSSION

### I.  LEGAL STANDARDS

#### A.  Summary Judgment

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quotation marks and citation omitted).  "Once the moving party demonstrates that there are not genuine issues of material fact, the nonmoving party must come forth with evidence sufficient to allow a reasonable jury to find in [her] favor." Id. (quotation marks and citation omitted).

However, a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.  Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks, alterations, and citation omitted).  "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A).  Therefore, a party's "unsupported denials . . . cannot, without citation to any evidence in the record, create a genuine issue of fact." Arista Recs. LLC v. Lime Grp. LLC, No. 06 CV 5936 KMW, 2011 WL 1641978, at *4 (S.D.N.Y. Apr. 29, 2011) (collecting cases).

At the summary judgment stage, "an invocation of the Fifth Amendment 'is not a substitute for relevant evidence,' and a litigant claiming the privilege is not 'freed from adducing proof in support of a burden which would otherwise have been [hers.]'" United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y., 55 F.3d 78, 83 (2d Cir. 1995) (quoting United States v. Rylander, 460 U.S. 752, 758, 761 (1983)). Accordingly, "the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." Id.

Finally, "'[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" Eviner v. Eng, No. 13-CV-6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)). However, "[b]road, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact." Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 261 (2d Cir. 2005).

**B.     Securities Fraud**

Section 10(b) of the Exchange Act "prohibits both sellers and buyers of securities, using the mails or an instrumentality of interstate commerce or the facility of a national securities exchange, from employing 'any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations.'" S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1466 (2d Cir. 1996) (alteration in original) (quoting 15 U.S.C. § 78j(b)).

Rule 10b-5 makes it unlawful for any person to use any means or instrumentality of interstate commerce,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"[T]o violate Section 10(b) and Rule 10b-5, a party must have '(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.'" S.E.C. v. Pentagon Cap. Mgmt. PLC, 725 F.3d 279, 285 (2d Cir. 2013) (quoting S.E.C. v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999)).

Section 17(a) of the Securities Act makes it unlawful "for any person in the offer or sale of any securities," by use of any means or instrumentality of interstate commerce, directly or indirectly:

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).  The Second Circuit has stated that "[e]ssentially the same elements are required under [the Securities Act] in connection with the offer or sale of a security" as under the Exchange Act and Rule 10b-5.  Monarch Funding Corp., 192 F.3d at 308 (citing First Jersey Sec., Inc., 101 F.3d at 1467).

There are two differences, however.  First, "[s]cienter is not required to prove a defendant violated [Section 17(a) of the Securities Act]."  S.E.C. v. Ginder, 752 F.3d 569, 574 (2d

Cir. 2014). Second, "under [the Securities Act], the 'plaintiff must [show] that defendant actually obtained money or property by means of the untrue statements.'" S.E.C. v. Farnsworth, 692 F. Supp. 3d 157, 177 (S.D.N.Y. 2023) (quoting S.E.C. v. Glantz, No. 94 Civ. 5737 (CSH), 1995 WL 562180, at *5 (S.D.N.Y. Sept. 20, 1995)).[3]

## II.    ANALYSIS

According to the SEC, "[t]he undisputed facts establish that Defendant Saw, a securities broker, sold securities in her elderly customer's brokerage account without his knowledge or permission and then stole over $2 million in sales proceeds while he was in the hospital recovering from an accident." (Pltf. Br. (Dkt. No. 34) at 7)  The SEC further contends that Saw's conduct constitutes securities fraud, because (1) she "undisputedly engaged in deceptive conduct and made material misrepresentations"; (2) she "undisputedly acted with scienter"; and (3) her conduct "indisputably occurred in connection with securities sales." (Id. at 24, 28, 30)

---

[3]  Under both the Securities Act and the Exchange Act, the SEC must also show that the fraud was committed "by use of any means" or instrumentality of "interstate commerce." 15 U.S.C. §§ 77q, 78j. The internet is "routinely recognized" by the Second Circuit "as an instrumentality of interstate commerce." United States v. Le, 902 F.3d 104, 112 (2d Cir. 2018). In her briefing, Saw does not contest that this element is satisfied. (See Def. Opp. (Dkt. No. 35)) The Court concludes that this element is met by, inter alia, the note Saw entered into the SmartWorks system on December 15, 2021, stating that Jiang had "decided to fully liquidate all his positions in [his Cetera] account]." (See Pltf. R. 56.1 Stmt. (Dkt. No. 33) ¶ 50; Def. R. 56.1 Cntrstmt. (Dkt. No. 38) ¶ 51 (admitting that the SmartWorks system may only be accessed remotely via the internet); see also Richter v. Achs, 962 F. Supp. 31, 33 (S.D.N.Y. 1997) ("'[I]t is well settled that the fraud itself need not be transmitted through the jurisdictional means. All that is necessary is that the designated means be used in some phase of the transaction, which need not be the part in which the fraud occurs.'") (quoting Heyman v. Heyman, 356 F. Supp. 958, 969 (S.D.N.Y. 1973)).

A.      **Whether the Evidence Establishes as a Matter**
        <u>**of Law that Saw Committed Securities Fraud**</u>

1.      <u>**Deceitful Conduct**</u>

"'Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the [Exchange] Act and Rules 10b-5(a) and (c) thereunder create what courts have called "scheme liability" for those who, with scienter, engage in deceitful conduct.'" <u>S.E.C. v. Wey</u>, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017) (quoting <u>S.E.C. v. Jean-Pierre</u>, No. 12 Civ. 8886 (LGS), 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015)).  It is well established that a securities broker violates Section 10(b) of the Exchange Act and Rule 10b-5 when she "sell[s] h[er] customer's securities and us[es] the proceeds for h[er] own benefit without the customer's knowledge or consent." <u>S.E.C. v. Zandford</u>, 535 U.S. 813, 815 (2002).[4]

Here, Saw sold Jiang's securities in his Cetera account, transferred the proceeds to an account held jointly by Saw and Jiang, and then transferred approximately $2 million from this account into various accounts held solely by Saw.  (See Pltf. R. 56.1 Stmt. (Dkt. No. 33) ¶¶ 53-61, 62-68, 69-74)  These transfers are apparent from Jiang and Saw's bank account records, and Saw does not contest that these transfers took place.  (See Def. R. 56.1 Cntrstmt. (Dkt. No. 38) ¶¶ 53-61, 62-68, 69-74)

In asserting that these transfers were fraudulent, the SEC cites to Jiang's testimony, in which he states that he did not know about or authorize any of Saw's transactions

---

[4]  The same is true under Section 17(a)(1) of the Securities Act.  <u>See</u>, <u>e.g.</u>, <u>S.E.C. v. Kane</u>, No. 97 CIV. 2931 (CBM), 2003 WL 1741293, at *3 (S.D.N.Y. Apr. 1, 2003) ("misappropriat[ing] approximately $595,000 of customer funds" is "fraudulent conduct" in "violation[] of Section 17(a) of the Securities Act"); <u>S.E.C. v. Collector's Coffee, Inc.</u>, 697 F. Supp. 3d 138, 170-71 (S.D.N.Y. 2023) ("misappropriation of funds" from investors sufficient to demonstrate a likelihood of success on the merits of the SEC's claim under Securities Act 17(a)(2)); <u>see also</u> <u>S.E.C. v. Kinetic Inv. Grp., LLC</u>, No. 8:20-CV-394-MSS-SPF, 2024 WL 4869623, at *30 (M.D. Fla. Nov. 22, 2024) ("misappropriation[] of investor funds for . . . personal use" can "serve as a basis for establishing scheme liability" under Sections 17(a)(1) and (3) of the Securities Act).

after his accident in November 2021. (See, e.g., Pltf. R. 56.1 Stmt., Ex. 1 (Jiang Dep.) (Dkt. No. 33-2) at 31:10-19 ("Q.  While you were still recovering from the accident, did you give Ms. Saw permission to transfer your money to a bank account that was solely in her name? . . . A.  No.  Q. After the accident in November 2021, did you give Ms. Saw permission to conduct any financial transactions on your behalf?  A.  No."))

In response, Saw says "that all transactions made by her were authorized and disclosed to Jiang and were made with his knowledge and consent or at his direction."  (Def. Opp. (Dkt. No. 35) at 9)  Saw does not offer evidence creating a material issue of fact as to whether her transfers were fraudulent, however.

As an initial matter, Saw asserted her Fifth Amendment privilege at deposition in response to all questions about these transfers, and a litigant who asserts her Fifth Amendment privilege is not excused from her obligation – at summary judgment – to offer evidence that creates a material issue of fact.  4003-4005 5th Ave., 55 F.3d at 83 ("[A]n invocation of the Fifth Amendment 'is not a substitute for relevant evidence,' and a litigant claiming the privilege is not 'freed from adducing proof in support of a burden which would otherwise have been [hers.]'") (quoting Rylander, 460 U.S. at 758, 761); S.E.C. v. Airborne Wireless Network, No. 21 CIV. 01772 (CM), 2023 WL 5938527, at *3 (S.D.N.Y. Sept. 12, 2023) ("[T]aking the Fifth does not create 'evidence' that raises a genuine issue of fact.").

And while Saw's Local Rule 56.1 Counterstatement asserts that Jiang authorized all of the transactions at issue in this case, Saw does not support her allegations with citations to admissible evidence.  Saw's Response to the SEC's material fact No. 73 is representative:

> 73.  Jiang did not authorize Saw to transfer funds from the [second TD Bank account] to [Saw's personal bank account] and was unaware that she did so. (Ex. 1 (Jiang Dep. Tr.) at 31:16-19; 31:21-32:1; 32:2-6.)

<u>Response No. 73</u>:  Disputed and denied in Paragraphs 49 to 51 of Saw's Amended Answer dated October 6, 2023.  Additionally, as and for an Eighth Affirmative Defense, Saw alleges that Jiang acted freely and voluntarily with regard to the allegations in Plaintiff's Complaint and that all actions tak[en] by Saw were with the knowledge and consent of Jiang.  It is further alleged in such defense, that such actions by Jiang included, but were not limited to the execution of documents and his authorizing and/or agreeing to those transactions, transfers and/or withdraw[als] related to his personal and brokerage accounts and/or those personal and business dealings referred to in Plaintiff's Complaint.  It is also the position of the Defendant that given Jiang's voluntary decision to issue a Power of Attorney in favor of Saw to handle his personal affairs, coupled with their long-term extremely close relationship and the serious credibility issues raised by his deposition testimony of March 19, 2024, different inferences can be drawn about whether Jiang gave Saw permission to transfer these funds from the [second TD Bank account] to [Saw's personal bank account] and whether he was aware that she did so.

(Def. R. 56.1 Cntrstmt. (Dkt. No. 38) ¶ 73)

Denials of this sort do not create a material issue of fact, because they are not accompanied by citations to admissible evidence.  "If portions of a Local Rule 56.1 counterstatement cite to no admissible evidence in support of its denials, the Court is instructed to disregard those portions and deem the factual statements in the original Local Rule 56.1 statements admitted."  <u>Mangahas</u>, 754 F. Supp. 3d at 483.  Moreover, where – as here – "a motion for summary judgment is properly supported by documents or other evidentiary materials," "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading. . . ."  <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009).  And while Saw argues that Jiang's deposition testimony presents "serious credibility issues" (Def. Opp. (Dkt. No. 35) at 8), "'[b]road conclusory attacks on the credibility of a witness' without more [are] insufficient to raise a genuine issue of material fact that would defeat a motion for summary judgment.'"  <u>Airborne Wireless Network</u>, 2023 WL 5938527, at *6 (quoting <u>Louis Vuitton Malletier S.A. v. LY USA, Inc.</u>, 472 F. App'x 19, 22 (2d Cir. 2012)); <u>see</u> <u>also</u> <u>McCullough v.</u>

Wyandanch Union Free Sch. Dist., 187 F.3d 272, 280 (2d Cir. 1999) (general attacks on a

witness's credibility are not sufficient to defeat a properly supported summary judgment motion).

Here, the evidence proffered by the SEC demonstrates that none of the transfers

and transactions at issue was authorized by, or disclosed to, Jiang, and Saw has proffered no

contrary evidence.  Unauthorized securities transactions of this sort are deceptive within the

meaning of the Exchange Act, the Securities Act, and Rule 10b-5.  Zandford, 535 U.S. at 820-21

(each sale of securities "was deceptive because it was neither authorized by, nor disclosed to,

[the victim client]"); S.E.C. v. Laura, 680 F. Supp. 3d 204, 233 (E.D.N.Y. 2023) ("It is well

established that an undisclosed intent to misappropriate funds is sufficient to establish scheme

liability on a motion for summary judgment.") (citations omitted).

In sum, the SEC has offered evidence sufficient to demonstrate that Saw engaged

in deceitful, fraudulent conduct in connection with the transactions and transfers at issue.

## 2.      **Material Misrepresentation**

The first element of securities fraud may also be satisfied by evidence that a

defendant made a material misrepresentation.  See Pentagon Cap. Mgmt. PLC, 725 F.3d at 285.

A misrepresentation "is material 'if there is a substantial likelihood that a reasonable [investor]

would consider it important in deciding how to [invest].'"  S.E.C. v. Mayhew, 121 F.3d 44, 51 (2d

Cir. 1997) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988)) (alterations in Mayhew).  A

misrepresentation made to a registered broker-dealer to induce that entity not to take action to

prevent a purchase or sale of securities may be material and actionable, as long as "materiality

[is] measured against how important a reasonable investor [would] consider[] a disclosure in

making an investment decision."  S.E.C. v. Honig, No. 18-CV-8175 (ER), 2023 WL 6386918, at

*22 (S.D.N.Y. Sept. 29, 2023).

Here, the SEC contends that "Saw made material misrepresentations to Cetera, a registered broker-dealer, in its internal computer system on approximately December 15, 2021," when she "falsely claimed that Jiang had decided 'to fully liquidate all his positions in this account' and that he 'want[ed] all his funds to be in cash in his bank account to be ready to be donated away/distributed.'" (Pltf. Br. (Dkt. No. 34) at 27 (quoting Pltf. R. 56.1 Stmt. (Dkt. No. 33) ¶ 50))

The evidence shows that these statements were false, because Jiang had not authorized Saw to liquidate his positions or to distribute the proceeds. (Pltf. R. 56.1 Stmt. (Dkt. No. 33) ¶ 49 (citing id., Ex. 1 (Jiang Dep.) (Dkt. No. 33-2) at 31:16-19))[5] And these false statements that Saw made to Cetera enabled her to sell Jiang's securities and to steal the proceeds in violation of Cetera's policies prohibiting such conduct. (Pltf. R. 56.1 Stmt., Ex. 6 (Cetera Registered Representative Manual) (Dkt. No. 33-7) §§ 4.12.5, 4.12.6, 4.12.20, 4.12.25)

Saw's misrepresentations to Cetera were also material, in that they enabled the fraud. Saw's false assertion that Jiang had authorized her to liquidate his portfolio is "so obviously important . . . that reasonable minds cannot differ on the question of materiality." S.E.C. v. Research Automation Corp., 585 F.2d 31, 35 (2d Cir. 1978) (quotation marks and citations omitted); Honig, 2023 WL 6386918, at *22 (finding defendant's misrepresentations to E*Trade material where they induced E*Trade to permit him to sell stock in violation of registration requirements); Tatintsian v. Vorotyntsev, No. 1:16-CV-7203-GHW, 2024 WL 3675606, at *9 (S.D.N.Y. Aug. 6, 2024) ("Courts in this district have held at summary judgment

---

[5] Saw denies that she acted without authorization when she sold the securities in Jiang's account (see Def. R. 56.1 Cntrstmt. (Dkt. No. 38) ¶ 54), but her denial is not accompanied by a citation to admissible evidence. Accordingly, the Court deems admitted the SEC's allegation that Saw falsely claimed that Jiang had decided "to fully liquidate all his positions" and convert his funds to cash. (See Pltf. R. 56.1 Stmt. (Dkt. No. 33) ¶¶ 49-50)

that obfuscation of the true use of an investment, as [defendant] did here, is material.")
(collecting cases).

The Court concludes that the SEC has established, as a matter of law, the first
element of securities fraud.

### 3.    Scienter

The next element of securities fraud is scienter.  "A false statement was made with
the requisite scienter if it was made with the 'intent to deceive, manipulate, or defraud.'"  S.E.C.
v. Sourlis, 851 F.3d 139, 144 (2d Cir. 2016) (quoting S.E.C. v. Obus, 693 F.3d 276, 286 (2d Cir.
2012)).  "'Scienter may be established through a showing of reckless disregard for the truth, that
is, conduct which is highly unreasonable and which represents an extreme departure from the
standards of ordinary care.'"  Id. (quoting Obus, 693 F.3d at 286).  Moreover, "[t]o prove
scienter, 'it is sufficient to show the defendant "intentionally engaged" in "manipulative
conduct."'"  S.E.C. v. Constantin, 939 F. Supp. 2d 288, 308 (S.D.N.Y. 2013) (quoting AUSA Life
Ins. Co. v. Ernst & Young, 206 F.3d 202, 221 (2d Cir. 2000)).

Here, there is ample evidence that Saw acted with the "intent to deceive,
manipulate, or defraud."  Sourlis, 851 F.3d at 144.  After obtaining the power of attorney from
Jiang, Saw (1) falsely stated in Cetera's SmartWorks system that Jiang had "decided to fully
liquidate all his positions" (Pltf. R. 56.1 Stmt. (Dkt. No. 33) ¶¶ 49-50); (2) liquidated more than
$2 million in securities from Jiang's Cetera account (id. ¶¶ 53-68); (3) transferred those proceeds
through a series of accounts to her personal bank account (id. ¶¶ 69-74); and (4) used those funds
for her personal expenses, cash withdrawals, and personal investments (id. ¶¶ 75-94) – all
without Jiang's knowledge or permission.  Moreover, the Power of Attorney that Saw used to
effectuate her fraudulent scheme expressly prohibited Saw from gifting herself Jiang's assets, but
she did so anyway.  (See id., Ex. 4 (POA) (Dkt. No. 33-5) at 6) ("IMPORTANT INFORMATION

FOR THE AGENT: . . . You may not use the principal's assets to benefit yourself or anyone else or make gifts to yourself or anyone else . . . .") (emphasis in original))  She also concealed and carried out her fraudulent scheme by falsely stating to Cetera that Jiang had decided to liquidate his investments.  (Pltf. R. 56.1 Stmt. (Dkt. No. 33) ¶¶ 49-50)

This unrebutted evidence is sufficient to demonstrate that Saw acted with scienter. See Airborne Wireless Network, 2023 WL 5938527, at *26 (finding at summary judgment that scienter element was satisfied where defendants had invoked their Fifth Amendment privilege at deposition and "offer[ed] no evidence to support any alternate version of events"); S.E.C. v. Ahmed, 308 F. Supp. 3d 628, 655 (D. Conn. 2018) (finding "ample evidence" of the defendant's scienter at summary judgment where he had misappropriated investor funds by transferring them to his personal bank account).

### 4.    **"In Connection with the Sale of Securities"**

The final element of a securities fraud claim is that the fraudulent conduct or material misstatements occurred "in connection with the purchase or sale of any security."  15 U.S.C. § 78j(b).[6]  Where the alleged fraudulent or deceptive scheme "coincide[s]" with securities transactions, the "in connection with" requirement is satisfied.  Zandford, 535 U.S. at 825.

In Zandford, for example, a broker sold securities from a customer's account without authorization, and then transferred the proceeds to the broker's personal accounts for personal use.  Id. at 815.  The Supreme Court held that such a fraudulent scheme – "in which the

---

[6]  While Section 17(a) of the Securities Act requires proof that fraud occurred "in the offer or sale of any securities," the analysis is the same.  15 U.S.C. § 77q(a); S.E.C. v. Spark Trading Grp., LLC, No. 18-CV-1498 (BMC), 2018 WL 6727349, at *2 n.2 (E.D.N.Y. Dec. 21, 2018) ("The relevant language of Section 17(a) of the Securities Act, which uses the term 'in' instead of 'in connection with' the sale of securities, is not narrower than the relevant language of Section 10(b) of the Exchange Act.").

securities transactions and breaches of fiduciary duty coincide" – satisfies the "in connection with" requirement.  Id. at 825.

The same analysis applies here, because Saw's deceptive conduct and the sale of securities from Jiang's Cetera account "coincide."  Like the defendant in Zandford, Saw sold securities from a customer's account without authorization and transferred the proceeds to other accounts for her personal use.  Accordingly, the final element of securities fraud is satisfied.

The Court concludes that the evidence establishes as a matter of law that Saw committed securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, and under Section 17(a) of the Securities Act.

## B.    Saw's Arguments Opposing Summary Judgment

In opposing the SEC's motion for summary judgment, Saw argues that (1) "the deposition testimony of . . . Jiang raises significant credibility issues and . . . conflicting inferences can be drawn from such testimony" (Def. Opp. (Dkt. No. 35) at 20); (2) Jiang maintained "an extremely close relationship" with Saw, which supports an inference that "he gave permission to Saw to liquidate and use some of his assets for personal use" (id. at 35); (3) the SEC has not submitted an affidavit from Jiang or an affidavit from a Cetera employee "attesting to the fact that Saw violated [Cetera's] rules[,] . . . regulations, policies[, or] procedures" (id. at 21-23); (4) Jiang can "read, understand and converse in the English language" (id. at 24); and (5) Jiang "admitted at his deposition that he voluntarily granted [a] Power of Attorney . . . in favor of [Saw]" (id. at 28).

### 1.    Jiang's Credibility

According to Saw, "Jiang's overall credibility is . . . of paramount importance" in determining whether Saw committed securities fraud.  (Id. at 20)  In arguing that Jiang lacked credibility, Saw cites two portions of his deposition testimony.

Saw first contends that, at deposition, Jiang "claimed to have never met any of the SEC attorneys present at his deposition," and stated that he had not spoken with them on the phone.  (Id. at 23-34 (emphasis omitted))  Later in his deposition, however, Jiang "completely changed his testimony and finally admitted[] that prior to his deposition[] he had met with [two SEC attorneys on] several occasions. . . ."  (Id. at 23-24)

When asked by defense counsel how he came to appear for the deposition, Jiang answered:  "Today I am here because the gentleman from the SEC asked me here to testify." (Def. Opp., Ex. 8 (Jiang Dep.) (Dkt. No. 35-9) at 43:23-24)  Moments later, defense counsel asked Jiang whether he had previously met with or spoken on the phone with the SEC attorneys. (Id. at 44:22-45:2)  Jiang answered "No."  (Id.)  When examined by the SEC later in the deposition, however, Jiang corrected his mistake and acknowledged that he had met and spoken with the SEC attorneys previously.  (See id. at 90:17-19 ("Q. . . . [Y]ou did meet with us before today?  A.  Yes."))  Jiang's temporary lapse on this minor point does not present a credibility issue as to the core of his testimony concerning Saw's deceit and fraud.  Phillips v. City of Middletown, No. 17-CV-5307 (CS), 2021 WL 4462821, at *11 (S.D.N.Y. Sept. 29, 2021) ("Minor inconsistencies on inconsequential issues are to be expected, and do not suffice to defeat summary judgment.") (citations omitted).

Saw also asserts that at deposition "Jiang claimed to have no relationship with Saw," which is "incredulous and impossible to fathom" given the record in this case.  (Def. Opp. (Dkt. No. 35) at 33)  But Jiang did not testify that he had "no relationship" with Saw.  He instead described her as a "financial advisor," and denied that she was "a friend."  (Id., Ex. 8 (Jiang Dep.) (Dkt. No. 35-9) at 82:9-14 ("Q. . . . [Saw] was your financial advisor, but over[]time you

developed a friendship with her as well? A. Financial advisor, yes. Friendship, no. Q. She

never became a friend of yours? A. No.")

In sum, even assuming that alleged "credibility issues" could preclude summary

judgment in the circumstances here, see Levi v. Commonwealth Land Title Ins. Co., No. 09 CIV.

8012 SHS, 2011 WL 4542904, at *4 (S.D.N.Y. Sept. 30, 2011) (arguments "regarding [a witness's]

credibility" are "not evidence," but rather "contentions without evidence [that] cannot defeat

summary judgment"), Saw has not identified any "credibility issues" regarding Jiang's testimony

that create a material issue of fact.

### 2.    Jiang's Personal Relationship with Saw

Saw asserts that she and Jiang "maintained an extremely close personal

relationship," and that Jiang approached her about "act[ing] as a guardian to raise children which

might be born as a result of a contemplated in vitro fertilization procedure."[7]  (Def. Opp. (Dkt.

No. 35) at 34-35; Def. R. 56.1 Cntrstmt. (Dkt. No. 38) ¶ 42))  According to Saw, from this alleged

"close personal relationship" one can reasonably infer that Jiang "gave permission to Saw to

liquidate and use some of his assets for her personal use." (Def. Opp. (Dkt. No. 35) at 35)

But the alleged "close personal relationship" between Jiang and Saw does not

create a material issue of fact as to whether she liquidated his portfolio without his knowledge or

authorization, and then used his assets for her own purposes. Jiang testified that she engaged in

---

[7]  Saw does not address in her Rule 56.1 Counterstatement or deposition Jiang's suggestion that
she could serve as the guardian of children that might be conceived as the result of an IVF
procedure. Jiang testified that after his wife died, he "was thinking about having IVF," because
"in China[,] for a man to have no children, it is a shame." (Def. R. 56.1 Cntrstmt., Ex. 8 (Jiang
Dep.) (Dkt. No. 35-9) at 17:10-16)  Given his age, Jiang concluded that he needed "someone as a
guardian to raise [any] kids" that might be born as the result of an IVF procedure.  Because "[a]t
that time [he] didn't have too [many] connection[s]," he "went to Clarice Saw and she agreed to
take care of the kids but she asked for double the cost to pay for the nannies." (Id. at 18:18-19:3)
Jiang ultimately decided not to pursue IVF, however, because he was "too old" to "get an
embryo." (Id. at 18:13-17)

such conduct, and his testimony is unrebutted.  (See Pltf. R. 56.1 Stmt., Ex. 1 (Jiang Dep.) (Dkt. No. 33-2) at 25:7-29:15)  At summary judgment, the non-moving party "'may not rely on conclusory allegations or unsubstantiated speculation" to defeat a summary judgment motion. F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)).  Accordingly, Saw's assertion that she had a "close personal relationship" does not provide a basis to deny the SEC's summary judgment motion.

### 3.    Lack of Affidavit from Jiang and Cetera Employee

Saw contends that the SEC's motion for summary judgment must be denied because the Commission did not submit an affidavit from Jiang or an affidavit from a Cetera employee explaining how Saw's conduct violated the Company's rules, policies and procedures. (See Def. Opp. (Dkt. No. 35) at 21-23)

As to Jiang, the SEC is entitled to rely on Jiang's deposition testimony, which is part of the record in this case.  See Fed. R. Civ. P. 56(c) ("[a] party asserting that a fact cannot be . . . genuinely disputed must support the assertion by:  (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]"  Fed. R. Civ. P. 56(c)(1).

Similarly, Cetera's Registered Representative Manual is part of the record in this case, and demonstrates that Saw violated Cetera's rules in multiple ways, including by commingling Jiang's funds with her own; maintaining a joint account with Jiang; obtaining power of attorney as to Jiang; and liquidating Jiang's account without his permission and stealing the proceeds.  (See Pltf. R. 56.1 Stmt., Ex. 6 (Cetera Registered Representative Manual) (Dkt. No. 33-7) §§ 4.12.5, 4.12.6, 4.12.20, 4.12.25).  Given that the Cetera Registered Representative

Manual is part of the record in this case, no affidavit from a Cetera employee is necessary to demonstrate Saw's violations of the Company's policies.

### 4. Jiang's English Language Capability

Saw asserts that the Complaint's claim that Jiang "was unable to speak, read, or understand English" is "directly refuted by Jiang's own deposition testimony[.]" (Def. Opp. (Dkt. No. 35) at 24)

Saw does not dispute, however, that Mandarin is Jiang's native language (Def. R. 56.1 Cntrstmt. (Dkt. No. 38) ¶ 3), and that he used a Mandarin interpreter at his deposition. (See Def. Opp., Ex. 8 (Jiang Dep.) (Dkt. No. 35-9) at 4:23-5:1)

In any event, Jiang's English language capability is not relevant to whether Saw liquidated Jiang's portfolio without his knowledge or authorization, and whether she used the proceeds for her own purposes.

### 5. Power of Attorney

Saw contends that Jiang "fully understood the powers" that he conferred on her via the Power of Attorney – powers "which he . . . voluntarily grant[ed] Saw" as to "his finances [and] his personal affairs[.]" (Def. Opp. (Dkt. No. 35) at 28) But the fact that Jiang entered into the Power of Attorney knowingly and voluntarily does not undermine the SEC's security fraud claims, because Saw's actions with respect to Jiang's assets were plainly prohibited by the Power of Attorney.

For example, under Section (n)(3) of the Power of Attorney, Saw is required to "keep [Jiang's] property separate and distinct from any assets [that she] own[s] or control[s], unless otherwise permitted by law." (Pltf. R. 56.1 Stmt., Ex. 4 (Dkt. No. 33-5) at 6) The Power of Attorney further provides that Saw "may not use [Jiang's] assets to benefit [her]self or anyone else or make gifts to [her]self or anyone else unless [Jiang] has specifically granted [her] that

authority in this document." (Id.)  It is undisputed that Jiang did not sign the gift authorization rider.  (Def. R. 56.1 Cntrstmt. (Dkt. No. 38) ¶ 17)  Accordingly, the Power of Attorney did not authorize Saw to use Jiang's assets for her own benefit, and the fact that Jiang entered into the Power of Attorney knowingly and voluntarily has no bearing on whether Saw committed securities fraud.

*     *     *     *

The Court concludes that the SEC has established as a matter of law that Saw committed securities fraud in violation of Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act by liquidating the securities in Jiang's Cetera account without his knowledge or authorization, and then using the proceeds for her own purposes.  Saw has not "come forth with evidence sufficient to allow a reasonable jury to find in [her] favor." Spinelli, 579 F.3d at 166 (quotation marks and citation omitted).  Indeed, the record is devoid of evidence that conflicts with the SEC's version of events.  Accordingly, the SEC is entitled to summary judgment on its claims.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment (Dkt. No. 32) is granted.  The Clerk of Court is directed to terminate the motion (Dkt. No. 32).

Plaintiff will submit briefing as to appropriate remedies by **August 14, 2025**.

Defendant will submit any opposition by **August 28, 2025**.

Dated: New York, New York
       July 25, 2025

SO ORDERED.

Paul G. Gardephe
United States District Judge